**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

**No. 25-2109**

---

TRACY GRYGIEL,

Plaintiff – Appellant,
v.

HEALTHEQUITY, INC,

Defendant – Appellee

---

On Appeal From A Judgment and Order of the District Court for the District of Massachusetts

---

**BRIEF OF THE PLAINTIFF/APPELLANT, TRACY GRYGIEL**

---

PLAINTIFF-APPELLANT TRACY GRYGIEL
Joseph L. Sulman, BBO #115200
Law Office of Joseph L. Sulman, Esq.
255 Bear Hill Road, Suite 204
Waltham, MA 02451
617) 521-8600
jsulman@sulmanlaw.com

Date: February 2, 2026

## TABLE OF CONTENTS


**Table of Authorities.................................... 4**

**Jurisdictional Statement........................................ 6**

**Statement of The Issues Presented for Review.......................6**

**Concise Statement of The Case.................................... 7**

**A. Factual Background.................................. 7**

**B. Procedural History .................................. 15**

**Summary of Argument............................................ 16**

**Argument............................................................ 19**

**I. Standard of Review.................................. 19**

**II. THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNTS I AND II. ............................................... 20**

A. The District Court Failed To Apply The Plausibility Standard in Evaluating Grygiel's Gender Discrimination Claims Under Counts I and II. .................................. 20

**III. . THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNTS III AND IV. ............................................ 28**

A. The District Court Failed To Follow State Court Interpretation of State Law and Did Not Apply The Correct Standard of Review in Dismissing Counts III and IV. ....... 28

B. The District Court Failed To Follow Binding Interpretation of Chapter 151B by The Massachusetts Supreme Judicial Court. ........................................ 29

C. The District Court Failed To Follow The Plausibility Standard and Accept The Well-Pleaded Facts as True. ....... 32

D. Grygiel's Conduct Was Protected Under Title VII's Opposition Clause. ...................................... 34

**IV. THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNT VI.... ................................................... 39**

A. The District Court Erred in Finding HIPAA Not A Well-Defined Public Policy. .................................... 39

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**Certificate of Compliance** .......................................... **43**

**Certificate of Service** .......................................... **44**

**Addendum** .......................................... **Add 1**

# Table of Authorities

## CASES

3137, LLC v. Town of Harwich, 126 F.4th 1, 8 (1st Cir. 2025).. 17
474 Mass. 382, 393 (2016)................................... 27, 28
*Ajayi v. Aramark Bus. Servs.*, No. 00 C 4403, 2004 U.S. Dist. LEXIS 3361, at *9 (N.D. Ill. Mar. 3, 2004) .................. 35
*Alexandre v. ASI Assurance Corp.*, 795 F. Supp. 3d 252, 257 (D. Mass. 2025) ............................................. 33
*Ballinger v. Town of Kingston*, Civil Action No. 18-11187-FDS, 2019 U.S. Dist. LEXIS 213122, at *32 (D. Mass. Dec. 10, 2019) 37
*Breach Litig.*, No. MDL No. 23-md-3083-ADB-PGL, 2025 U.S. Dist. LEXIS 147581, at *153 (D. Mass. July 31, 2025) .............. 38
*Cochrane v. Quattrocchi*, 949 F.2d 11, 14 (1st Cir. 1991)...... 33
*Collazo v. Bristol-Myers Squibb Mfg.*, 617 F.3d 39, 47 (1st Cir. 2010) ................................................. 32, 33
*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023) ..................................................... 23
*Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). 32
*Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002) ..................................................... 22
*Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012) 24, 26
*Hidalgo-Semlek v. Hansa Med.*, Inc., 498 F. Supp. 3d 236, 258 (D.N.H. 2020) .............................................. 38
*Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976) .............................. 32
*Kassel v. Gannett Co.*, 875 F.2d 935, 950 (1st Cir. 1989)...... 28
*Lemire v. Silva*, 104 F. Supp. 2d 80, 93 (D. Mass. 2000)....... 37
*Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502 (2001)........... 17
*Luceus v. Rhode Island*, 923 F.3d 255, 258 (1st Cir. 2019)..... 18
*Ma v. Westinghouse Elec. Co., LLC*, 559 F. App'x 165, 171 (3d Cir. 2014) ................................................ 25
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)......... 30
*Mission Prod. Holdings, Inc. v. Old Cold LLC (In re Old Cold LLC)*, 879 F.3d 376, 383 (1st Cir. 2018) .................... 33
*Moores v. Greenberg*, 834 F.2d 1105, 1107 (1st Cir. 1987).. 26, 28
*Murray v. Lahey Clinic*, 19 Mass. L. Rep. 31, 2004 Mass. Super. LEXIS 659, at *4 (Aug. 19, 2004) ..................... 37
*Nelson v. Town of Westminster*, No. 23-40069-MRG, 2024 U.S. Dist. LEXIS 172978, at *38 (D. Mass. Aug. 30, 2024) ..... 29, 31
*Niswander v. Cincinnati Ins.* Co., 529 F.3d 714, 722 (6th Cir. 2008) ..................................................... 34
*O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) ....................................... 34, 35
*Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) ..................................................... 16

*Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015)..... 31
*Rios-Jimenez v. Sec'y of Veterans Affairs*, 520 F.3d 31, 39-40 (1st Cir. 2008) ........................................ 20
*Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013) ........................................ 18, 22, 23, 24
*Rodríguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014) ........................................ 25
*Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 216 (1st Cir. 2000) ........................................ 21
*Ryan v. Holie Donut, Inc.*, 82 Mass. App. Ct. 633, 636 (2012).. 36
*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) ........................................ 17
*Smith v. Chi. Transit Auth.*, 667 F. App'x 158, 160 (7th Cir. 2016) ........................................ 34
*Sutherland v. Peterson's Oil Serv.*, 126 F.4th 728, 744 (1st Cir. 2025) ........................................ 36
*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)..... 18, 19
*Thanh C. Tran v. Liberty Mut. Grp. Inc.*, 105 Mass. App. Ct. 1105, 2024 Mass. App. Unpub. LEXIS 764, at *2 (Dec. 3, 2024) 27
*Thomas v. Liv Grp., Inc.*, 791 F. Supp. 3d 200, 211 (D. Mass. 2025) ........................................ 25
*Waithe v. Cardinal Cushing Ctrs., Inc.*, No. 24-12530-NMG, 2025 U.S. Dist. LEXIS 174465, at *15 (D. Mass. Sep. 8, 2025) ..... 18
*Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64 (1st Cir. 2002) ........................................ 18, 19
*Wilkins v. Swinton Home Care, LLC, No. 24-cv-2601-ABA*, 2025 U.S. Dist. LEXIS 172979, at *13-14 (D. Md. Sep. 5, 2025) .... 19
*Williams v. Florida Atlantic University*, No. 15-60621-CIV-GAYLES/TUR, 2016 U.S. Dist. LEXIS 36217, at *3 (S.D. Fla. Mar. 21, 2016) ........................................ 21
*Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 666 n.11 (D.R.I. 1998) ........................................ 26, 28

**STATUTES**

42 U.S.C.S. § 2000e-3........................................ 31
M.G.L. c. 214, § 1B........................................ 36

**RULES**

Fed. R. Civ. P. 12(b)(6)........................................ 16

## Jurisdictional Statement

The district court had diversity jurisdiction under 28 U.S.C. § 1332 as one of the claims raised a violation of 42 U.S.C. § 2000e. App. 7. Order of dismissal with prejudice was entered by the district court on Oct. 31, 2025. A notice of appeal was timely filed on Nov. 12, 2025. This court has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of The Issues Presented for Review

1. Whether the district court erred in granting the Motion to Dismiss of Defendant/Appellee HealthEquity, Inc. on the claims of gender discrimination under Chapter 151B and Title VII under Counts I and II of the Amended Complaint where the allegations, accepted as true and reasonable inferences drawn therefrom in Plaintiff/Appellant's favor, show a plausible entitlement to relief?

2. Whether the district court erred in granting the Motion to Dismiss of Defendant/Appellee HealthEquity, Inc. on the claim of retaliation under Chapter 151B under Counts III of the Amended Complaint where the district court failed to apply binding Massachusetts Supreme Judicial Court precedent?

3. Whether the district court erred in granting the Motion to Dismiss of Defendant/Appellee HealthEquity, Inc. on the claims of retaliation under Chapter 151B and Title VII under Counts III and IV of the Amended Complaint where the

allegations, accepted as true and reasonable inferences drawn therefrom in Plaintiff/Appellant's favor, show a plausible entitlement to relief?

4. Whether the district court erred in granting the Motion to Dismiss of Defendant/Appellee HealthEquity, Inc. on the claim of wrongful discharge in violation of policy under Counts VI of the Amended Complaint where the allegations, accepted as true and reasonable inferences drawn therefrom in Plaintiff/Appellant's favor, show a plausible entitlement to relief?

## Concise Statement of The Case

### A. Factual Background

Plaintiff/Appellant Tracy Grygiel is a woman, who was hired in May 2023 at Defendant/Appellee HealthEquity, Inc. as a Senior Data Architect. App. 12-13. Her job description listed one of among of her responsibilities as "documenting and maintaining… data standards". *Id. at 12.* Grygiel work duties involved ensuring HealthEquity's compliance with HIPAA's collective, comprehensive, and specific requirements for the privacy and security of protected health information data that HealthEquity received, created, maintained, or transmitted Incident to the services it provides for its customers. *Id. at 16.* HealthEquity is a Utah base Health Savings Account provider

and is a subject to all HIPAA-related rules, acts, regulations, codes, and laws. *Id. at 12.*

Grygiel direct supervisor the entire time she worked for HealthEquity was a man, Darek Easterly ("Easterly"), and Grygiel was the only woman working under Easterly in a technical role. App. 13. At the time Grygiel was hired she was an experienced data-systems professional with decades of work in enterprise data architecture and cybersecurity. *Id.*

Shortly after being hired in May or June 2023, Grygiel conducted a security audit of HealthEquity's Oracle 19c RAC Replicated Database, using the SANS Institute's Cybersecurity audit checklist for Oracle Database.[1] *Id. at 13.* Grygiel was instructed by Esterly to conduct this security audit. *Id.*

Grygiel found that the Database failed the audit due to a systemic failure to implement proper security controls, among other deficiencies. App. 13-14*.* For example, rather than assigning unique credentials to each user who required access to the database, HealthEquity used shared login accounts for multiple users, secured only with widely shared passwords that were not regularly changed or updated. *Id at 14.* Shared passwords create accountability issues and increase the risk of

[1] The SANS Institute of Cybersecurity Audit Checklist for Oracle Database as an industry-standard checklist for auditing Oracle database.

unauthorized access. *Id.* After conducting a security audit, Grygiel promptly informed Easterly that HealthEquity's database had failed the audit and provided him with a copy of the report. *Id. at 15.* Grygiel reiterated these concerns during the one-on-one meeting with Esterly in June 2023. *Id.*

Upon learning of the results, Easterly dismissed Grygiel's concerns, assuring her – incorrectly -- that existing security measures were adequate and that no remedial action was needed. App. 15. Instead, Easterly and Greg Fortune ("Fortune"), the former Database Architect who was responsible for maintaining the database, responded to Grygiel's findings with dismissive condescension and hostility, because Grygiel was a woman in a male-dominated industry providing critical, highly knowledgeable and negative feedback about security concerns that Easterly and Fortune had long neglected to adequately address. *Id. at 15-16.* When it became clear that management would not act on the failed audit, Grygiel demonstrated to other HealthEquity personnel, including members of the security and tech support teams, how she could bypass the company's existing database security controls, further evidencing the seriousness of the vulnerabilities she had reported. *Id. at 16*. Grygiel reported to Easterly and Fortune that there were numerous vulnerabilities and immediate threats to the database that HealthEquity's then-current security measures did not sufficiently address that she

reasonably believed would result in a violation of HIPAA. *Id.* at 16-17.

Around the same time Grygiel attended a meeting with Project Manager Ajay Sahu and Esterly to discuss proposal for accelerating a program (or "job") that ran every night and consumed hours to complete. App. 17. Although the job served no identifiable purpose, Sahu and HealthEquity refused to remove it due to concerns about destabilizing the already outdated database system. *Id.* Unhappy with Grygiel's suggestions, Sahu called Grygiel a "token woman" and "Miss Know-It-All". *Id.* Although Sahu repeated these epithets frequently, even in public space where he could be overheard, no one spoke up to challenge or object to Sahu's use of the derogatory names when referring to Grygiel. *Id. at 18.* Encouraged by lack of discipline for such comments, other coworkers continued calling her names like "token woman" and "Miss Know-It-All". *Id. at 20.*

On July 21, 2023, Easterly placed Grygiel on a Performance Improvement Plan ("First PIP"). App. 18. The criticisms underlying the PIP were unfounded, faulting her both for not completing an assignment while going to the hospital and for completing it after she woke up from surgery. *Id.* Grygiel alleges that Easterly issued the PIP to push her out of the company in retaliation for identifying security deficiencies he and Fortune had overlooked. *Id.* Approximately one week later, HR

representative Rebecca Decker directed Grygiel to take two weeks of vacation, citing her long hours and incomplete surgical recovery. *Id. at 18-19.* Upon her return, Decker informed her that the First PIP had been rescinded and should be considered "water under the bridge." *Id. at 19.*

In November 2023, Easterly began excluding Grygiel from team meetings. App. 19. In short time Grygiel's calendar was almost entirely empty, while others on her team had calendars full of meetings. *Id.* For the few meetings in which Grygiel was still included, Esterly instructed Grygiel that she was not allowed to speak during the meeting. *Id.*

In or around December 2023, Easterly informed Grygiel that her bonuses would only be $3,000. App. 20. Grygiel was surprised that her annual bonuses were drastically reduced, as her offer letter guaranteed a bonus equal to 12.5 % of her salary -- approximately $21,250. *Id.* Easterly claimed the reduction was justified because she had not performed sufficient work during the year. *Id.* In fact, Grygiel had completed a major assigned project ahead of schedule after working extensive overtime hours. *Id.* Easterly nevertheless refused to credit her work for the fiscal year, stating he was delaying implementation of her recommendations until the following year and would therefore reduce her 2023 bonus. *Id.* Grygiel reported the unjust bonus reduction to Human Resources. *Id.*

In December 2023, federal authorities investigated a HealthEquity data breach involving the same security vulnerabilities Grygiel had identified in her initial Oracle 19c RAC Database Security Audit. App. 21. Easterly instructed Grygiel to remain silent during a meeting with investigators about the breach. *Id.* HealthEquity experienced another breach in March 2024, which it did not disclose for more than three months while conducting a forensic review. *Id.* On July 2, 2024, the company filed a Form 8-K with the SEC reporting that a vendor's compromised user account had been used to access externally stored data. *Id.* Approximately 4.3 million individuals were affected, and the compromised information included names, contact information, employee identifiers, Social Security numbers, dependent information, and certain payment card data—some of which was further leaked by the hacker. *Id.* Grygiel's earlier Security Audit had identified the same vulnerabilities that enabled the attacker to infiltrate the vendor's data repository and obtain private member information. *Id. at 21-23.*

In late February 2024, Kulp told Grygiel that Easterly had assigned the two of them to work on a project that had no deadline. App. 22. After Grygiel completed the task in a few weeks, Kulp informed her that Easterly had changed the requirements and now wanted her to complete the same task in a different manner that required her to teach herself Python, a

programming language. *Id.* Upon Grygiel completing a new task, she was informed by Kulp that Easterly now wanted to incorporate new data from different sources into the project. *Id.* Grygiel worked extra hours to complete this request. *Id.* Vice President of Technological Security, Anatoly Chikanov, saw that Easterly was setting Grygiel up for failure, and told her: "You're killing yourself. Every time you turn something in, they add something to it." *Id.* HealthEquity facilitator Lucinda Lopez ("Lopez") reported Easterly's treatment of Grygiel to HealthEquity's internal reporting line. *Id.*

Shortly after Lopez's report, on April 19, 2024, Grygiel had a meeting with Easterly and HealthEquity's Vice President of Human Resources, Jordan Griggs, where they presented a second PIP and told her that she could either accept the PIP or her employment would end. App. 23. During this meeting, Griggs told Grygiel that "the chief complaint is that you're a know-it-all and will not stay in your lane." *Id.* Chikanov told Grygiel that she was "in [a] protected class (female, over certain age) etc." and that the "[PIP] covers the company from that." *Id.*

At this point, it became clear to Grygiel that HealthEquity was discriminating and retaliating against her. App. 23 Therefore, to preserve evidence for potential claims, Grygiel emailed copies of her First and Second PIPs, training certifications she had earned, and important email

correspondence to her personal email address sometime in late April 2024. *Id.* None of the emails that Grygiel sent to her personal email address contained confidential company information. *Id.* HealthEquity discovered the emails that Grygiel sent and, on April 30, 2024, brought Grygiel into a meeting where they made her delete the emails and performance-related documents she had sent to herself. *Id. at 24.* HealthEquity brought Grygiel in for a meeting about the emails. *Id.*

On May 7, 2024, HealthEquity terminated Grygiel's employment. App. 24. Griggs stated that the termination was due to HealthEquity's determination that she had violated the company's Security and People policy. *Id.*

Since the termination, Grygiel immediately began actively seeking subsequent employment, even including remote positions nationwide. App. 24. On at least one occasion, Grygiel was on the precipice of a formal employment offer by a putative employer, having had explicit discussions of duties, responsibilities, pay, benefits, and other terms of employment, only to have the employer withdraw their interest in her candidacy inexplicably before an employment offer was consummated. *Id.* She also had several promising interviews, second interviews, and skills evaluations, many of which were followed by continuing interest and positive, exclusive discussions with hiring authorities about the detailed, precise

terms of prospective employment. App. 25. All of these potent leads were abruptly abandoned by the potential employer, or otherwise suddenly and inexplicably withdrawn. *Id.* It took nine months of ardent and persistent job searching and innumerable employment applications for positions in her field of expertise before Grygiel secured employment as a Lead Data Architect for the State of Maine Department of Transportation. *Id.*

## Procedural History

On July 10, 2025, Defendant filed a Notice of Removal with the district court, asserting diversity jurisdiction over Grygiel's state law claims. App. 7. On August 11, 2025, Grygiel filed six-count Amended Complaint in the district court (the "Complaint"), alleging claims of gender discrimination under Chapter 151B and Title VII (Counts I and II), claims of retaliation under Chapter 151B and Title VII (Counts III and IV), interference under Chapter 151B concerning post-employment actions (Count V),[2] and wrongful discharge in violation of public policy under Count VI. App. 27-30. Defendant filed a Motion to Dismiss on August 25, 2025, which Grygiel opposed. The district court granted the Defendant's Motion and dismissed the Complaint via a Memorandum and Order dated October 14, 2025 and Order of

[2] Grygiel does not appeal dismissal of Count V.

Dismissal dated October 31, 2025. App. 72. Grygiel filed a Notice of Appeal on November 12, 2025. App. 73.

## Summary of Argument

The district court erred in dismissing the claims of gender discrimination in violation of Chapter 151B and Title VII under Counts I and II, respectively. Under established law, Grygiel's complaint only needs to state sufficient facts to plausibly allege a cause of action for discrimination under her claims. *Infra* at 20-21. The district court failed to correctly apply the plausibility standard in evaluating the gender discrimination claims, requiring in effect, if not explicitly, sufficient evidence to satisfy the prima facie case under the McDonnell Douglas burden shifting paradigm. *Id.* at 21-22.

The district court similarly erred by analyzing the allegations of discrimination piecemeal, or allegation by allegation, rather than *in toto*. *Infra* at 25. A complaint does not need to allege any particular piece of evidence, direct or circumstantial, or show any particular proof concerning the decision-maker. Rather, the necessary elements of a cause of action can be inferred from the allegations. *Id.* 23-24. The Complaint in this case contains numerous allegations from which inferences can be drawn for each element of a cause of action

for gender discrimination under Title VII and Chapter 151B. *Id.* at 26-27.

On the retaliation claims alleging violations of Chapter 151B and Title VII, respectively, under Counts III and IV, the district court first erred by failing to follow the binding authority of the Massachusetts Supreme Judicial Court that an employee's self-help discovery in aid of a prospective claim of discrimination can, if done reasonably, be protected conduct under the anti-retaliation clause of Chapter 151B. *Infra* at 28-31. The district court further erred by failing to follow the plausibility standard in analyzing both Chapter 151B and Title VII retaliation claims where it found that, even assuming protected conduct, there was no causal connection between the conduct and the adverse action. *Id.* at 32-33. This finding fails to accept all the well-pleaded facts as true and draw all reasonable inferences in the favor of Grygiel where the Complaint alleges that she engaged in protected conduct, Defendant placed her on paid administrative leave immediately thereafter, and fired her one week later. *Id.* at 33-34.

This Court should also rule that Grygiel's self-help discovery is potentially protected under the opposition clause of Title VII and her claim of retaliation is plausible. *Infra* at 34-38. The opposition clause of Title VII protects an employee from retaliation for even informally opposing an employment

activity that might violate Title VII. *Id.; Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015). An employee who engages in opposition activity must hold a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Infra* at 35; *Fantini v. Salem State Coll*., 557 F.3d 22, 32 (1st Cir. 2009). Whether Grygiel acted reasonably and in good faith in emailing herself internal document based on her belief that Defendant was discriminating against her based on gender is a factual question that cannot be determined based on the pleadings alone. *Infra* at 36.

Other federal courts outside this Circuit, in similar cases involving self-help discovery, have recognized that Title VII's opposition clause requires "balancing of competing interests . . . between the employer's recognized, legitimate need to maintain an orderly workplace and to protect confidential business and client information, and the equally compelling need of employees to be properly safeguarded against retaliatory actions." *Niswander v. Cincinnati Ins*. Co., 529 F.3d 714, 722 (6th Cir. 2008); *Infra* at 37. The allegations in the Complaint did not allow an evaluation of these competing interests. Thus, the district court improperly concluded that the claim of retaliation was not plausible. *Infra* at 38.

Finally, the district court erred in dismissing the claim of wrongful termination in violation of public policy. *Infra* at

39. The district court failed to recognize that HIPAA is a well-recognized public policy generally, if not explicitly in Massachusetts, and that Massachusetts has a well-recognized policy protecting the invasion of privacy of its residents through statute, M.G.L. c. 214, § 1B, which has been interpreted as applying to unauthorized disclosure of medical information. *Id.* at 39-40. The district court also incorrectly found that Grygiel insufficient alleged causation, where the Complaint contains several allegations that Grygiel reported concerns that health information data were not being stored by Defendant securely and that Easterly and others reacted with hostility to her concerns, leading to an adverse action. *Id.* at 40-41.

## Argument

### I. Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), "the complaint must contain enough factual material to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Id.* This involves a two-step analysis: first, the court should begin by identifying and disregarding

statements in the complaint that merely offer legal conclusions, although "the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable. . . . Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id.* Second, the court takes the non-conclusory, non-speculative) facts as true, "drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *3137, LLC v. Town of Harwich*, 126 F.4th 1, 8 (1st Cir. 2025). This is a "context-specific approach" that requires the reviewing court to draw on its "judicial experience and common sense." *Id.* As former Supreme Court Justice David Souter wrote: "The make-or-break standard is that the ***combined*** allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.) (emphasis added).

## II. THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNTS I AND II.

### A. The District Court Failed To Apply The Plausibility Standard in Evaluating Grygiel's Gender Discrimination Claims Under Counts I and II.

A claim of discrimination under Chapter 151B requires showing membership in a protected class, harm, discriminatory

animus, and causation. *See Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502 (2001). A claim of discrimination under Title VII requires showing membership in a protected class, qualification for the position, an adverse employment actions, and "evidence connecting [plaintiff's] membership in the protected class to the adverse employment actions." *Waithe v. Cardinal Cushing Ctrs., Inc.*, No. 24-12530-NMG, 2025 U.S. Dist. LEXIS 174465, at *15 (D. Mass. Sep. 8, 2025), *citing Luceus v. Rhode Island,* 923 F.3d 255, 258 (1st Cir. 2019). Under established law, Grygiel's complaint only needs to state sufficient facts to plausibly allege *a cause of action* for discrimination under Title VII and Chapter 151B. The allegations in the Complaint plausibly allege an entitlement to relief under these elements.

A plaintiff does not need to establish a prima facie case under *McDonnell Douglas* at the pleading stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under McDonnell Douglas also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."); *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013) (affirming that *Swieriewicz* remains "good law"); *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64 (1st Cir. 2002) (describing McDonnell Douglas as a "method for proving cases rather than the definition of a cause of action").

In its decision, the district court phrased its analysis of Grygiel's discrimination allegations under both the Twombly plausibility standard and the McDonnell Douglas standard. Add. 8-10. Indeed, the district court explicitly stated in its decision that "a plaintiff must first establish a prima facie case of discrimination." Add. 8.[3] After explaining the requirements of a prima facie case for nearly two pages, *id.* at 10-11, the district court couched its directive with the following caveat: "Although it *is not necessary* to plead facts sufficient to establish a prima facie case at the pleading stage, the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim," *id.* 11 (emphasis added). The district court's final analysis of the discrimination claims betrays this sentiment, however.

In ruling that Grygiel did not plausibly allege a claim of gender discrimination under either Title VII or Chapter 151B, the district court cited to *Rios-Jimenez v. Sec'y of Veterans*

[3] The McDonnell Douglas framework is not actually required at the summary judgment stage. See *Weston-Smith v. Cooley Dickinson Hosp.*, Inc., 282 F.3d 60, 64 (1st Cir. 2002) ("McDonnell Douglas framework is a 'flexible evidentiary standard' whose requirements "vary depending on the context"; it is a method for proving cases rather than the definition of a cause of action. Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (holding that a Title VII plaintiff need not plead the elements of a McDonnell Douglas prima facie case to survive a motion to dismiss). *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64 (1st Cir. 2002)

*Affairs*, 520 F.3d 31, 39-40 (1st Cir. 2008), for the principle that "[d[irect evidence of discrimination does not include stray remarks in the workplace, particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself." Add. 12. But *Rios-Jiminesz* is inapposite on a motion to dismiss as it was decided at the Rule 56 summary judgment stage, not the Rule 12 pleading stage, and involved an evaluation of whether a mixed-motive analysis was appropriate. *Id.* The *sufficiency* of Grygiel's evidence is a matter for a Rule 56 motion, not a Rule 12 motion. *See Ma v. Westinghouse Elec. Co., LLC,* 559 F. App'x 165, 171 (3d Cir. 2014) ("Although a plaintiff can survive a motion to dismiss with plausible allegations, summary judgment can be avoided only by proffering evidence sufficient to create a material dispute of fact.")

The district court also cited to *Rodriguez-Reyes v. Molina -Rodriguez,* where the district court granted a motion to dismiss on a discrimination claim because it found that the complaint only included conclusory allegations that the decision-maker "was aware of the plaintiffs' affiliations with opposing political parties." *Id.* This Court reversed, however, explaining that the decision-maker's "knowledge may be inferable from other allegations in the complaint [for pleading purposes]." *Id.; Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir.

2023) ("For pleading purposes, circumstantial evidence often suffices to clarify a protean issue such as an actor's motive or intent.") (internal quotation marks omitted). The Court found such inferences in the complaint's other allegations, including that the decision-maker engaged in a "witch-hunt scheme to obtain information as to the affiliation of each employee [of the AIJ] in order to dismiss those who were not affiliated with the NPP" and that "after the NPP took control of the agency, the new leaders began to 'talk about politics.'". *Id.* (all quotation marks and parentheticals in original).

Here, as in *Rodriguez-Reyes*, the Complaint contains numerous allegations from which inferences can be drawn of the decision-makers discriminatory intent. Grygiel was the only woman working for Easterly in a technical role. Easterly attended the meeting with Sahu where she was referred to as a "token woman" and "Miss Know-It All" and the comments were repeated publicly at the company. No male colleagues supported Grygiel or condemned Sahu's comments. Grygiel disagreed with a recommendation by Easterly and Griggs to move the company's data to the cloud, after which hostility from Grygiel's male colleagues increased. Then Easterly started excluding her from meetings or telling her that she was not allowed to speak at the few meetings that she was invited to. Easterly reduced her

bonus, gave her a second PIP, and told her that she could either second the second PIP or resign.

The district court's emphasis on the decision-maker's knowledge, Add. 11-12, places an unfair burden on Grygiel that goes beyond the requirements of the pleading stage. *Rodríguez-Reyes*, 711 F.3d at 56; *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012) ("The plausibility threshold simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct."). Where the district court states that Grygiel's allegation that Easterly acted with discriminatory intent "rests entirely on her conclusory description of his reaction to the security audit" that occurred a nearly year before her termination, Add. 11, this ignores numerous other allegations showing circumstantial evidence of Easterly's discriminatory animus. For example, Griggs (Vice President of Human Resources) delivered Grygiel's Second PIP in the presence of Easterly while making several derogatory comments to her after Sahu had referred to as a "token woman."

When analyzing the allegations, the district court ignored this compelling discriminatory statement. Grygiel's Project Manager Ajay Sahu referred to her as a "token woman" and "Miss Know-It-All." App. 17, Complaint, ¶40. Sahu "repeated these minimizing, misogynist epithets frequently, even in public

spaces where he could be overheard [and] no one spoke up to challenge or object to Sahu's use of inappropriate, pejorative, derogatory names when referring to Grygiel." App. 18, Complaint, ¶41. Although the district court recited both the "token woman" and "Miss Know-It-All" statements in its factual summary, it only acknowledged Sahu's "Miss Know-It-All" comment and disregarded the "token woman" insult altogether in assessing the sufficiently of the allegations. Add. 11-13. Easterly was at the meeting where Sahu referred to Grygiel as a "token woman." *Id.* Calling Grygiel a "token women" is stark evidence of discriminatory animus.

The district court's minimizing of these statements as "stray remarks" at the pleading stage is erroneous. A reviewing court must accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor. Thus, Grygiel *was* in fact called a token woman and Miss Know-It All in a meeting with Easterly. Grygiel's male colleagues were "[e]ncouraged by a lack of discipline for the name-calling by Sahu and other coworkers [and] continued to call her names like 'token woman' and 'Miss Know-It-All.'" App. 20, Complaint, ¶55. The Complaint later alleges that both Griggs and Easterly met with Grygiel to deliver a second PIP and told her that she could either accept the PIP or resign. App. 23, Complaint ¶78. They

told her that the "chief complaint is that you're a know-it-all and will not stay in your lane." App. 23, Complaint ¶81.

These are not conclusory allegations, but well-pleaded facts that allow a reasonable inference that Grygiel was terminated based on her gender. *See Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 216 (1st Cir. 2000) ("[S]tereotyped remarks . . . can certainly be evidence that gender played a part."); *Williams v. Florida Atlantic University*, No. 15-60621-CIV-GAYLES/TUR, 2016 U.S. Dist. LEXIS 36217, at *3 (S.D. Fla. Mar. 21, 2016) (denying motion to dismiss gender discrimination claim where female plaintiff was called "know-it-all" by Defendant"). The allegations easily suffice to allege a cause of action of gender discrimination. *See Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002) (reversing order granting motion to dismiss sexual harassment claim by finding sufficient "elements of a cause of action for discrimination under Title VII"); *Rodríguez-Reyes*, 711 F.3d at 54. As *Rodríguez-Reyes* explains, "[t]he relevant question for a district court in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Id.* at 55.

Grygiel's allegations show each element of a cause of action under Chapter 151B and Title VII. She is a woman performing her position at HealthEquity and suffered an adverse employment action and there is evidence (through the well-pleaded facts, *supra*) that her gender motivated the decision to terminate her employment.

For the foregoing reasons, the Court should reverse the district court's order dismissing Counts I and II.

## III. THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNTS III AND IV.

### A. The District Court Failed To Follow State Court Interpretation of State Law and Did Not Apply The Correct Standard of Review in Dismissing Counts III and IV.

A claim of retaliation under both Title VII and Chapter 151B requires proof of the following: 1) protected conduct, 2) a material adverse action, and 3) a causal nexus between elements one and two. *See Rodríguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014); *Thomas v. Liv Grp., Inc.*, 791 F. Supp. 3d 200, 211 (D. Mass. 2025).

In dismissing the claim of retaliation under Chapter 151B, the district court failed to apply binding Massachusetts Supreme Judicial Court precedent in the interpretation of state law. *See Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 666 n.11 (D.R.I. 1998), *citing Moores v. Greenberg*, 834 F.2d 1105, 1107 (1st Cir.

1987) ("Binding interpretations of state laws are made by state supreme courts, not by federal circuit courts."). The district court also failed to accept the well-pleaded facts as true and draw all reasonable inferences in Grygiel's favor in dismissing both claims of retaliation under Chapter 151B and Title VII. *See Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012) (motion to dismiss review requires "accept[*ing*] the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor".) Finally, based on the well-pleaded allegations and reasonable inferences drawn therefore, this Court should rule that the Complaint adequately alleges a claim of retaliation under the opposition clause of Title VII.

### B. The District Court Failed To Follow Binding Interpretation of Chapter 151B by The Massachusetts Supreme Judicial Court.

The district court doubted whether Grygiel engaged in protected conduct under either state or federal anti-discrimination law when she sent herself documents, via email, to "preserve evidence" for a potential discrimination claim in the form of internal documents (so-called "self-help discovery"). App. 23; Add. 14 (noting that the court is "skeptical that what Grygiel terms self-help discovery . . . is protected conduct under either Title VII or Chapter 151B").

Yet Grygiel's self-help discovery is the same activity that the Massachusetts Supreme Judicial Court held was potentially

protected conduct under Chapter 151B in *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.* In *Verdrager*, the SJC considered the actions of an associate attorney who, believing she was subject to gender discrimination, forwarded to herself attorney voicemail transcripts and other documents protected by attorney-client confidentiality and rules of privilege to aid in a potential discrimination claim. 474 Mass. 382, 393 (2016). The SJC held that "such conduct may in certain circumstances constitute protected activity under [Chapter 151B], but only if the employee's actions are reasonable in the totality of the circumstances.[4] *Id.* at 410; *Thanh C. Tran v. Liberty Mut. Grp. Inc.*, 105 Mass. App. Ct. 1105, 2024 Mass. App. Unpub. LEXIS 764, at *2 (Dec. 3, 2024) (describing jury trial with c. 151B retaliation claim based on self-help discovery).

At the pleading stage, Grygiel's allegations make an adequate showing that her self-help conduct was reasonable. She alleged a reasonable belief that she was being discriminated against in violation of the law. App. 18, 24; Complaint, ¶¶42,

---

[4] Notably, the SJC in *Verdrager* considered the fact that some of the material forwarded by the attorney was protected by privilege, but did not find this fact to be dispositive on the issue on whether her conduct was reasonable. *Id.* at 412 ("The shield of confidentiality should not be turned into a sword to defeat discrimination claims by employee-attorneys whose proof of discrimination may be found in such privileged and confidential sources.")

83. She alleged that "[t]o preserve evidence for potential claims, [she] then sent copies of her First and Second PIPs, training certifications she had earned, and important email correspondence to her personal email address sometime in late April, 2024." *Id.*, ¶83. She also alleged that "[n]one of these emails [she] sent to her personal email address contained confidential company information." *Id.*, ¶84.

Federal courts sitting in diversity must follow the interpretation of state law by the respective state's highest court. *Zahn*, 218 B.R. at 666, *citing Moores v. Greenberg*, 834 F.2d at 1107. Grygiel pled claims against Defendant under both Chapter 151B (Counts I and III) and Title VII (Counts I1 and IV). While there are no decisions applying *Verdrager's* self-help holding to Title VII, the district court was not free to ignore the decision's applicability to the state law claim. *See Kassel v. Gannett Co.*, 875 F.2d 935, 950 (1st Cir. 1989) ("[A] diversity court must take state law as it finds it: not as it might conceivably be, some day; nor even as it should be.")

Accordingly, the district court erred by failing to adhere to the construction of Chapter 151B by the SJC that self-help discovery, reasonably taken, can be protected conduct under Chapter 151B.

### C. The District Court Failed To Follow The Plausibility Standard and Accept The Well-Pleaded Facts as True.

The district court ruled that, even if Grygiel engaged in protected conduct, "she has not plausibly alleged that any protected conduct was the but-for cause of HealthEquity's firing of her." Add. 14-15. The district court's conclusion runs counter to the plausibility standard and the plain language of the Complaint. The district court found that Grygiel's allegation that Defendant fired her "because of" her protected conduct to be "conclusory and speculative", Add. 14-15, but there is nothing conclusory or speculative about the allegations. As the Complaint states, immediately after Grygiel gathered evidence to support her discrimination claim, Defendant brought her in for a meeting and questioned her about the self-help. App. 23-24, Complaint, ¶¶83-85. One week later, Defendant terminated her employment by characterizing her conduct as alleged policy violations. *Id.*, ¶¶86-87. *Nelson v. Town of Westminster*, No. 23-40069-MRG, 2024 U.S. Dist. LEXIS 172978, at *38 (D. Mass. Aug. 30, 2024) ("Temporal proximity alone can meet the relatively light burden of establishing a causal connection for retaliation.")

The district did not accept the well-pleaded facts as true and draw all reasonable inferences in Grygiel's favor. The district court found that "[t]he plausibility of [Grygiel's]

allegations is greatly weakened, moreover, by Grygiel's acknowledgment that HealthEquity stated it was firing her for violating company policy." Add. 16. But the fact that Grygiel alleged that Defendant characterized her termination as a violation of policy does not make the characterization an undisputed fact. In other words, Grygiel did not allege that *she violated a company policy*, but rather that she was told by one of the decision-makers that this was the reason for her termination. *Id.*, Complaint, ¶87. It is routine for a defendant in a retaliation case to put forward a non-discriminatory reason for an adverse action and for the plaintiff to challenge that reason as pretextual, or false. Indeed, these are the second and third stages of the McDonnell Douglas burden-shifting paradigm. Add. 9, *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the preceding allegation, Grygiel stated that Defendant "exploited, deliberately misconstrued, and exaggerated Grygiel's self-help discovery efforts as alleged policy violations." App. 24; Complaint, ¶86. The district court wholly disregarded this factual allegation.[5]

---

[5] Under the district court's reasoning, a plaintiff could never allege a defendant's purported non-discriminatory reason for an adverse action in a complaint without pleading himself out of court.

In sum, and following *Verdrager*, the Complaint contains well-pleaded facts for all the elements of a cause of action of retaliation under Chapter 151B. Grygiel alleged protected conduct. She alleged that Defendant terminated her employment. She alleged that Defendant terminated her employment one week after the protected conduct. *Id.*, ¶87; *Nelson*, 2024 U.S. Dist. LEXIS 172978, *38. These well-pleaded facts make a claim of retaliation under Chapter 151B plausible.

**D. Grygiel's Conduct Was Protected Under Title VII's Opposition Clause.**

Under Title VII, an employer cannot discriminate or otherwise punish an employee because "he has opposed any practice made an unlawful employment practice by this title." 42 U.S.C.S. § 2000e-3. "Unlike the participation clause, which protects an employee from retaliation for direct engagement with Title VII proceedings, the opposition clause sweeps even more broadly and protects an employee for more informally opposing an employment activity that might violate Title VII." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015).

An employee who engages in opposition activity must hold a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). *See also Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 231

(1st Cir. 1976) (explaining range of activities protected by the opposition clause and that ultimate test is that employee's conduct cannot go "too far");[6] *Collazo v. Bristol-Myers Squibb Mfg.*, 617 F.3d 39, 47 (1st Cir. 2010) (ruling that employee terminated after accompanyig co-worker to meeting to support report of sexual harassment by co-worker presented sufficient evidence of retaliation under opposition clause of Title VII).

In *Collazo*, this Court found that a "jury could reasonably view [the plaintiff's] persistent efforts to help [a co-worker] initiate her sexual harassment complaint and urge Human

---

[6] *Hochstadt* explained:

> It is less clear to what extent militant self-help activity falling between these two poles, such as particular types of on-the-job opposition to alleged discrimination, vociferousness, expressions of hostility to an employer or superior and the like, are protected. In the instant case, the issue is clouded by a sophisticated employment setting which lacks a rigid structure and within which it is not always easy to assess when an employee - in this case a highly educated senior scientist - clearly oversteps the bounds.
>
> In such instances, we think courts have in each case to balance the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.

*Id.*

Resources to act upon that complaint as resistant or antagonistic to the complained-of conduct." *Id.* at 47. Drawing all inferences in her favor (as required at the motion to dismiss stage, a reasonable jury could take the same view of Grygiel's self-help discovery. Whether she acted reasonably and in good faith in sending herself the documents in question is a factual question that cannot be determined based on the pleadings alone. *See Alexandre v. ASI Assurance Corp.*, 795 F. Supp. 3d 252, 257 (D. Mass. 2025) (determination as to what constitutes good faith is "ordinarily a question of fact to be determined by the jury");[7] *Cochrane v. Quattrocchi*, 949 F.2d 11, 14 (1st Cir. 1991) ("[T]he reasonableness' of the defendants' conduct was a question of fact for the jury to determine from the totality of a number of specific and, in many instances, disputed facts.").

In similar cases involving self-help discovery, federal courts outside the First Circuit have recognized that the opposition clause of Title VII requires "balancing of competing interests between the employer's recognized, legitimate need to maintain an orderly workplace and to protect confidential

---

7 There are other contexts where good faith is a mixed question of fact and law. *See Mission Prod. Holdings, Inc. v. Old Cold LLC (In re Old Cold LLC)*, 879 F.3d 376, 383 (1st Cir. 2018) (explaining that good faith, in the context of Section 363 of Bankruptcy Code, raises a mixed question of fact and law).

business and client information, and the ***equally*** compelling need of employees to be properly safeguarded against retaliatory actions." *Niswander v. Cincinnati Ins*. Co., 529 F.3d 714, 722 (6th Cir. 2008) (emphasis added) (internal ellipse omitted); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) ("[E]mployee's opposition activity is protected only if it reasonable in view of the employer's interest in maintaining a harmonious and efficient operation."). The Seventh Circuit has set forth the following factors to assess this balancing: how the plaintiff obtained the documents, whom he shared them with, the type of confidences revealed, their relevancy to the discrimination charge, whether the plaintiff had a good-faith belief in their relevancy, the scope of any policy allegedly violated, and whether the plaintiff could have sought the evidence in a way that would not have violated the policy. *See Smith v. Chi. Transit Auth.*, 667 F. App'x 158, 160 (7th Cir. 2016), *citing Niswander*, 529 F.3d at 722.

The Complaint does not contain facts necessary to allow the district court to have concluded that the claim of retaliation was not plausible because it does not permit an evaluation of these competing interests. *Smith*, 667 F. App'x at 160; *Collazo*, 617 F.3d at 47.

Rather, the district court simply presumed, implicitly, that the interests weighed in favor of the Defendant, but this

type of reasonableness determination cannot be made on the pleadings alone. For instance, in *O'Day*, the Ninth Circuit agreed that the plaintiff "has a legitimate interest in preserving evidence of McDonnell Douglas' unlawful employment practices," but faulted him for showing the documents in question to another co-worker who was being laid off and "rummaging through his supervisor's office for confidential documents" and "copying documents." *O'Day*, 79 F.3d at 763 (finding that after-acquired evidence of employee's self-help discovery cut off damages of age discrimination verdict). *See Ajayi v. Aramark Bus. Servs.*, No. 00 C 4403, 2004 U.S. Dist. LEXIS 3361, at *9 (N.D. Ill. Mar. 3, 2004) (denying motion for summary judgment on retaliation claim where plaintiff "copied documents to which she routinely had access").

The district court had no facts before it beyond the four corners of the Complaint from which it could conclude that Grygiel's opposition activity was not reasonable or done in good faith. Grygiel only alleged that emails she sent to herself consisted of her "First and Second PIPs, training certifications she had earned, and important email correspondence." Complaint, ¶83. She specifically alleged that "none of these emails . . . contained confidential company information." *Id.*, ¶84. Accordingly, the well-pleaded allegations plus the reasonable

inferences drawn therefrom in Grygiel's favor state a plausible claim of retaliation under the opposition clause of Title VII.

For the foregoing reasons, this Court should reverse the order of dismiss on Counts III and IV.

## IV. THE COURT SHOULD REVERSE THE ORDER OF DISMISSAL ON COUNT VI.

### A. The District Court Erred in Finding HIPAA Not A Well-Defined Public Policy.

A claim of wrongful termination in violation of public policy in Massachusetts requires showing that an otherwise at-will employee is discharged due to "assertion of a legally guaranteed right, compliance with a legal requirement, or refusal to commit prohibited conduct." *Ryan v. Holie Donut, Inc.*, 82 Mass. App. Ct. 633, 636 (2012); *Sutherland v. Peterson's Oil Serv.*, 126 F.4th 728, 744 (1st Cir. 2025). The district court ruled that HIPAA is not a well-defined public policy and, even were it so, the allegations do not sufficiently show causation. Add. 18-20. This disregards case law and the pleadings.

Massachusetts has enacted an invasion of privacy statute with its own private right of action. M.G.L. c. 214, § 1B. The law reads: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages." *Id.* Courts

have construed this law to apply to the unauthorized disclosure of medical records. "Without doubt, a persons's [sic] medical condition and treatment are private facts protected by ch. 214, § 1B." *Lemire v. Silva*, 104 F. Supp. 2d 80, 93 (D. Mass. 2000) (brackets in original); *Ballinger v. Town of Kingston*, Civil Action No. 18-11187-FDS, 2019 U.S. Dist. LEXIS 213122, at *32 (D. Mass. Dec. 10, 2019); *Murray v. Lahey Clinic*, 19 Mass. L. Rep. 31, 2004 Mass. Super. LEXIS 659, at *4 (Aug. 19, 2004) (denying summary judgment to employer who released medical records of former employee to her ex-husband without authorization). This statute in conjunction with HIPAA shows a public policy that supports Grygiel's claim.

Moreover, while there are no decisions in the First Circuit or Massachusetts that directly find HIPAA to set forth a public policy specifically for Massachusetts, several decisions show HIPAA is a well-defined public policy generally. *See Hidalgo-Semlek v. Hansa Med.*, Inc., 498 F. Supp. 3d 236, 258 (D.N.H. 2020) (explaining that, while HIPAA contains no private right of action, the "statute still embodies the strong public policy that medical records and personal health information should be afforded strict confidentiality and privacy protections"; *Sec. Breach Litig.*, No. MDL No. 23-md-3083-ADB-PGL, 2025 U.S. Dist. LEXIS 147581, at *153 (D. Mass. July 31, 2025) (denying motion

to dismiss claim under the Connecticut Unfair and Deceptive Trade Practice Act based on public policy expressed in HIPAA).

The district court's secondary ruling that Grygiel did not allege facts to show causation is incorrect. She alleged several places in the Complaint that she reported concerns that health information data were not being stored by Defendant securely. Complaint, ¶¶21, 34-36, 50, She alleged that Easterly and others reacted with hostility to her concerns. *Id.*, ¶¶23, 24, 28, 37-40, 52-54, 56-58. She alleged that these events led to an adverse action. The district court cherry-picked two allegations that it characterized as conclusory – Add. 19, Complaint, ¶¶37, 106 – while disregarding the well-pleaded allegations consisting of Grygiel's HIPAA-related concerns and the Defendant's negative responses that resulted in the adverse action.

For these reasons, the Court should reverse the district court's dismissal of Count VI.

## Conclusion

For the foregoing reasons, the Court should reverse the district court's Order of Dismissal of October 31, 2025 and Memorandum and Order of October 14, 2025.

Respectfully submitted,
PLAINTIFF TRACY GRYGIEL,
By her attorneys,

/s/ Joseph Sulman

Joseph L. Sulman, BBO #663635
Law Office of Joseph L. Sulman
255 Bear Hill Road, Suite 204
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com

February 2, 2026

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32(A)(7)(B)

I hereby certify that this document complies with the requirements under Local Rule 32(A)(7)(B) and has 8,162 words, excluding the Table of Contents, Table of Authorities, Certificate of Compliance, and Addendum.

I also certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionate type spaced Courier New Font using Microsoft Word 365 and 12-point font.

/s/ Joseph L. Sulman
Joseph Sulman

February 2, 2026

# CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this document, with the addendum, on counsel for Defendants-Appellants via the Court's Electronic Filing System on January 12, 2026, and that two paper copies will be served by First-Class Mail per Fed.R.App.P 31(b) as required by the Court.

/s/ Joseph L. Sulman
Joseph Sulman

February 2, 2026.

# ADDENDUM

## TABLE OF CONTENTS

1. Memorandum and Order, Oct. 14, 2025 ............................................ Add. 2

2. Order of Dismissal, Oct. 31, 2025 ........................................... Add. 22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRACY GRYGIEL, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 25-cv-11970-ADB |
| HEALTHEQUITY, INC., | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Tracy Grygiel ("Grygiel") brings gender-discrimination, retaliation, interference and wrongful-termination claims against her former employer, HealthEquity, Inc. ("HealthEquity"), alleging that HealthEquity fired her for discriminatory reasons and in retaliation for whistleblowing and then impeded her post-termination job search. [ECF No. 11 ("Amended Complaint" or "Am. Compl.")]. HealthEquity moves to dismiss Grygiel's claims under Federal Rule of Civil Procedure 12(b)(6). [ECF No. 13]. For the reasons set forth below, the motion is **GRANTED**.

# I. BACKGROUND

## A. Factual Background

The following facts are drawn from the Amended Complaint. For purposes of this motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

HealthEquity is a Utah-based company that services Health Savings Accounts and administers health benefit plans provided by employers. [Am. Compl. ¶¶ 3, 5].[1] In May 2023, HealthEquity hired Grygiel as a Senior Data Architect, [id. ¶ 8], and she worked in this role from Massachusetts, where she lives, interacting with her co-workers "by remote means," [id. ¶¶ 2, 4]. Grygiel's direct supervisor at HealthEquity was a man named Derek Easterly, and Grygiel was the only woman working under Easterly "in a technical role." [Id. ¶¶ 12, 13].

Soon after she was hired, Grygiel performed a security audit of HealthEquity's "Oracle 19c RAC Replicated Database" using an industry-standard checklist. [Am. Compl. ¶ 15 & n.1]. The audit was necessary to ensure that HealthEquity was in compliance with federal privacy laws and regulations that govern protected health information, including the Health Insurance Portability and Accountability Act ("HIPAA"), the HIPAA Privacy Rule, the HIPAA Security Rule, and the Health Information Technology for Economic and Clinical Health Act. [Id. ¶¶ 6–7, 31, 33]. The database failed the audit "due to a systemic failure to implement proper security

---

[1] A Health Savings Account is a type of tax-advantaged savings account designed for individuals covered under high-deductible health plans that lets those individuals set aside money on a pre-tax basis to pay for qualified medical expenses. Health Savings Account (HSA), HealthCare.gov, https://www.healthcare.gov/glossary/health-savings-account-HSA/

controls, such as role-based access, data monitoring, and period audits, among other serious concerns and elevated risks," [id. ¶ 16], "concerns" that, "[i]f unremedied," could have resulted in violations of federal privacy law, [id. ¶ 35], or so Grygiel "reasonably believed," [id. ¶ 36].

Grygiel "immediately" sent Easterly a copy of the failed audit report and verbally told him that the database had failed the audit during a one-on-one meeting, [Am. Compl. ¶ 21]; she also reported her concerns to Greg Fortune, the "former Database Architect responsible for maintaining the Database," [id. ¶ 23], and Anatoly Chikanov, HealthEquity's Vice President of Technological Security, [id. ¶ 34]. According to the Amended Complaint, Easterly and Fortune "reacted with dismissive condescension and hostility to Grygiel's identification of security noncompliance issues because Grygiel—a woman in a male-dominated industry—was providing them directly with critical, highly knowledgeable negative feedback about security concerns that Easterly and Fortune had long neglected to adequately address." [Id. ¶ 28].

Following the failed audit, and "continuing throughout her employment," Grygiel "was met with nonchalance, passive aggression, ridicule, and retaliatory treatment from HealthEquity," including Easterly, Fortune, and "other male coworkers." [Am. Compl. ¶ 38]. Around the time of the audit, Grygiel attended a meeting with Easterly and HealthEquity Project Manager Ajay Sahu to discuss how to "speed-up a program . . . that ran every night on the [d]atabase and took hours to complete." [Id. ¶ 39]. "Unhappy with Grygiel's suggestions . . . Sahu called Grygiel a 'token woman' and 'Miss Know-It-All.'" [Id. ¶ 40]. Sahu repeated these comments "frequently, even in public spaces where he could be overheard," [id. ¶ 41], but nobody challenged Sahu or offered Grygiel any support, [id. ¶ 43]. When Grygiel discussed the comments with HealthEquity's Director of Support Engineering, Sarah Kulp, Kulp

stated that "she, not Grygiel, was a 'token woman' because Grygiel was 'the only person on the team who [was] actually technical.'" [Id. ¶ 42].

Three months after Grygiel started working for HealthEquity, on July 21, 2023, Easterly put Grygiel on a performance improvement plan, based, in part, on Grygiel's failure to complete an assignment because she had surgery. [Am. Compl. ¶¶ 44–45]. Grygiel contends that the criticisms contained in the plan "had no merit," [id. ¶ 45], and that the plan was issued "in an attempt to force her out of the company" because Easterly and Fortune "were upset that Grygiel, a woman, had found problems that they had not and because she disclosed her anxiety and took [a] brief leave for [a] surgery," [id. ¶ 46]. One week into the plan, HealthEquity "instructed Grygiel to take two weeks of vacation," [id. ¶ 47], and, when she returned, she found the plan "was no longer in effect," [id. ¶ 48].

In December 2023, Easterly and Sahu proposed moving HealthEquity's data to a Cloud server, "believing this would solve the security issues they could no longer deny, and because HealthEquity was running out of disk space." [Am. Compl. ¶ 49]. When Grygiel expressed her opinion that the move to the Cloud would not solve the "ongoing security issues the way Easterly and Sahu believed it would," [id. ¶ 50], her colleagues "became upset" and their hostility toward Grygiel "increased." [Id. ¶¶ 51–52]. Easterly excluded her from meetings, [id. ¶ 53], and told her not to speak in meetings in which she was still included, [id. ¶ 54], and her "male colleagues continued to call her names like 'token woman' and 'Miss Know-It-All,'" [id. ¶ 55]. When the federal government investigated HealthEquity over a data breach "related to the very same issues" that Grygiel had identified in her security audit, Easterly asked Grygiel to attend a meeting with investigators, but told her to remain silent throughout the meeting, stating that it was "none of [her] business." [Id. ¶¶ 63–64]. At the end of the year, Easterly told Grygiel that

her annual bonus would "only be $3,000," significantly less than the $21,250 bonus she had expected based on her offer letter. [Id. ¶¶ 56–57]. Easterly justified the reduction by pointing to Grygiel's performance, but, according to the Amended Complaint, his claim that her work was insufficient was "patently false." [Id. ¶¶ 58–61].

On April 19, 2024, Easterly and Jordan Griggs, HealthEquity's Vice President of Human Resources, presented a second performance improvement plan to Grygiel. [Am. Compl. ¶ 76]. According to the Amended Complaint, this plan "was also baseless and relied on false accusations by Easterly." [Id. ¶ 77]. As Grygiel told Easterly and Griggs that the complaints against her were "incorrect" and that "she was being set up for failure," Griggs "began crossing items off the [plan] as Grygiel explained why each of them w[as] baseless." [Id. ¶¶ 79–80]. Griggs told her that "the chief complaint is that you're a know-it-all and will not stay in your lane," [id. ¶ 81], and Chikanov, who was not at the meeting, separately told her said that she was "in [a] protected class (female, over certain age) etc." and that the plan "cover[ed] the company from that," [id. ¶¶ 76, 82].

At this point, "[i]t became clear to Grygiel" that HealthEquity was discriminating and retaliating against her, and she started forwarding performance-related documents and emails to her personal email address "[t]o preserve evidence for potential claims." [Id. ¶ 83]. When HealthEquity discovered Grygiel's "self-help discovery efforts," it made her delete the emails and performance-related documents that she had sent herself and put her on paid administrative leave pending an investigation. [Id. ¶¶ 85–86]. On May 7, 2024, HealthEquity terminated her employment, and Griggs stated that she was being terminated based on HealthEquity's determination that she had violated the company's "Security and People policy." [Id. ¶ 87].

Grygiel "immediately began actively seeking subsequent employment." [Am. Compl. ¶ 89]. Although she had worked in the "enterprise data system field" for thirty years and had never been unemployed for more than a month, [id. ¶ 88], it took "nine months of ardent and persistent job searching and innumerable employment applications" for her to find a job, [id. ¶ 93]. "On at least on[e] occasion," she was "on the precipice of a formal employment offer . . . only to have the employer withdraw their interest in her candidacy inexplicably." [Id. ¶ 90]. Other employers, too, "abruptly . . . or otherwise suddenly and inexplicably," abandoned her application after initial "promising interviews, second interviews, and skills evaluations." [Id. ¶¶ 91–92]. Grygiel alleges, "[u]pon information and belief," that HealthEquity retaliated against her "by purposefully giving negative references and/or other misleading or damaging information to Grygiel's potential employers" to interfere with her efforts to secure employment. [Id. ¶ 98].

**B. Procedural History**

On June 5, 2025, Grygiel initiated this action in Massachusetts state court. [ECF No. 1-2]. HealthEquity was served with the state-court complaint and summons on June 20, 2025, and, on July 10, 2025, removed this lawsuit to federal court pursuant to 28 U.S.C §§ 1441 and 1446. [ECF No. 1]. On July 21, 2025, HealthEquity filed a motion to dismiss for failure to state a claim, [ECF No. 6], which was mooted when Grygiel filed her Amended Complaint on August 11, 2025, [Am. Compl.]; [ECF No. 12]. HealthEquity filed a motion to dismiss the Amended Complaint for failure to state a claim on August 25, 2025, [ECF No. 13], Grygiel opposed the motion on September 8, 2025, [ECF No. 15], and HealthEquity replied on September 15, 2025, [ECF No. 16].

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679).

## III. DISCUSSION[2]

HealthEquity moves to dismiss all six counts in the Amended Complaint, which include claims for gender discrimination in violation of Mass. Gen. Laws ch. 151B, § 4 ("Chapter 151B") (Count I) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title

---

[2] The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332. See [ECF No. 1 at 1–2].

VII") (Count II); retaliation in violation of Chapter 151B (Count III) and Title VII (Count IV); interference in violation of Chapter 151B (Count V); and wrongful termination in violation of public policy (Count VI).

### A. Gender Discrimination (Counts I and II)

In Counts I and II, Grygiel alleges that HealthEquity terminated her because of her gender. [Am. Compl. ¶¶ 111, 116]. HealthEquity moves to dismiss these claims on the basis that she has not alleged that the relevant decisionmaker, Easterly, engaged in any discriminatory conduct against her. [ECF No. 14 at 5–7]. In her opposition, Grygiel focuses on the comments that Griggs made to her while presenting her second performance improvement plan, and argues these comments, considered alongside her allegations about her work environment as a whole, suffice to state a claim; she also argues that her co-workers influenced decisionmakers into taking adverse action against her, and that she has sufficiently alleged that Easterly and Griggs harbored discriminatory animus against her. [ECF No. 15 at 7–11].

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Chapter 151B makes it unlawful "[f]or an employer . . . because of the . . . sex . . . of any individual . . . to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." Mass. Gen. Laws ch. 151B, § 4(1). Both Title VII and Chapter 151B thus prohibit "disparate treatment" discrimination, where an employer treats a particular person less favorably than

others because of a protected trait.[3] Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 270 (1st Cir. 2022) (Title VII); Diaz v. City of Somerville, 59 F.4th 24, 28 (1st Cir. 2023) (Chapter 151B). For claims brought under either statute, where there is no direct evidence of discrimination, courts employ versions of the well-known three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Diaz, 59 F.4th at 28–29 (explaining difference between federal and Massachusetts law in application of framework).[4]

Under McDonell Douglas, a plaintiff must first establish a prima facie case of discrimination; if she succeeds, the burden shifts to the defendant to present evidence of a legitimate non-discriminatory reason for the adverse action; and if the defendant provides such a reason, the burden shifts back to the plaintiff to prove that the defendant's purported reason was pretextual. 411 U.S. at 802–04. Generally speaking, to establish a prima facie case of employment discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for her job; (3) she suffered an adverse employment action at the hands of her employer; and (4) there is some evidence of a causal connection between her membership in a protected class and the adverse employment action. Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011) (Title VII); Audette v. Town of Plymouth, 858 F.3d 13, 23 (1st Cir. 2017)

---

[3] A "disparate treatment" discrimination claim is a claim of intentional discrimination, which distinguishes it from a "disparate impact" discrimination claim, which "involves unintentional discrimination whereby a neutral policy or employment practice has a disparate impact on members of a protected class." Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 270 & n.6 (1st Cir. 2022).

[4] Chapter 151B "has been interpreted largely to mirror Title VII," and because "[n]either party has identified a material distinction between the federal and state laws" for purposes of this decision, the Court "will consider the claims jointly." Thornton v. Ipsen Biopharmaceuticals, Inc., 126 F.4th 76, 81 (1st Cir. 2025) (first quoting Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 131 (1st Cir. 2004), and then quoting Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 12 n.1 (1st Cir. 2024)).

(similar for Chapter 151B). The last two elements of this test "var[y] according to the nature of the plaintiff's claim." Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (quoting Alvarado-Santos v. Dep't of Health, 619 F.3d 126, 132 (1st Cir. 2010)); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) ("[T]he precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978))). For example, if a plaintiff alleges that she was fired for discriminatory reasons, she can establish a prima facie case by showing that "(1) she was within a protected class, (2) [she] possessed the necessary qualifications and adequately performed her job, (3) but was nevertheless dismissed and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (quoting Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005)). Although "[i]t is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage[,] . . . the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013); see also Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) ("[N]o single allegation need [establish] . . . some necessary element [of the cause of action], provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible." (quoting Ocasio–Hernández v. Fortuño–Burset, 640 F.3d 1, 14–15 (1st Cir. 2011))).

Here, the Amended Complaint does not contain sufficient facts to render Grygiel's claims of gender discrimination plausible. Specifically, Grygiel's contention that Easterly, her direct supervisor, acted with discriminatory intent rests entirely on her conclusory description of his reaction to the security audit that took place nearly a year before HealthEquity terminated her

employment. [Am. Compl. ¶ 28 ("Easterly . . . reacted with dismissive condescension and hostility . . . because Grygiel—a woman in a male-dominated industry—was providing [him] directly with critical . . . negative feedback . . . .")]. Likewise, although comments allegedly made by Griggs during the discussion of Grygiel's second performance plan may have echoed alleged earlier gendered comments by others, they did not reference her gender at all or otherwise plausibly suggest that she was fired for a discriminatory reason. Compare [Am. Compl. ¶ 81 ("Griggs told Grygiel that 'the chief complaint is that you're a know-it-all and will not stay in your lane.'")], with [id. ¶¶ 40 (Sahu allegedly calling Grygiel "Miss Know-It-All"), 55 (Grygiel's male colleagues allegedly "continu[ing] to call her names like . . . 'Miss Know-It-All'"). Finally, the remarks of Grygiel's co-workers, including Sahu and Chikanov, who the Amended Complaint does not allege were decisionmakers or in a position to influence decisionmakers, do not permit the inference that HealthEquity discriminated against her when it fired her. See Rios-Jimenez v. Principi, 520 F.3d 31, 40 (1st Cir. 2008) ("Direct evidence of discrimination 'does not include stray remarks in the workplace, particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself.'" (quoting Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996))); O'Connor v. Northshore Int'l Ins. Servs., 61 F. App'x 722, 724 (1st Cir. 2003) ("The fact that one who lacked authority to fire [plaintiff] may have—unbeknownst to management—harbored animosity toward her because of her religion is insufficient to state a claim that she was fired in violation of Title VII."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (noting that "probativeness [of stray remarks] is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers" (emphasis omitted)

(quoting McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998))). Here, even accepting Grygiel's allegations as true, she has not pleaded facts that permit the reasonable inference that HealthEquity fired her because of her gender. Accordingly, HealthEquity's motion is **GRANTED** as to Counts I and II.

**B. Retaliation (Counts III and IV)**

In Counts III and IV, Grygiel alleges that HealthEquity terminated her in retaliation for engaging "in self-help discovery to further a potential claim of gender discrimination." [Am. Compl. ¶¶ 119, 124]. HealthEquity moves to dismiss these claims on the basis that the Amended Complaint fails to allege a causal connection between any protected activity and Grygiel's termination, and, instead, alleges that she was terminated for violating company policy. [ECF No. 14 at 7–9]. Grygiel responds that her sending of copies of her performance improvement plans and important work emails to her personal email was "protected activity," and that she adequately alleged that HealthEquity knew about and terminated her because of this activity. [ECF No. 15 at 11–12].

In addition to the substantive provision discussed above, Title VII also contains an antiretaliation provision, which prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. 2000e-3(a); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61–62 (2006) (noting distinction between substantive provision and antiretaliation provision); see also Stratton v. Bentley Univ., 113 F.4th 25, 38 (1st Cir. 2024) ("Put broadly, Title VII's substantive provision protects against discrimination based on who one is . . . while the retaliation provision protects what one does . . . ."). Chapter 151B similarly contains a "separate

and independent cause of action" for retaliation, Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1087 (Mass. 2000), prohibiting "any person" from "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [Mass. Gen. Laws. ch. 151B, § 5]," Mass. Gen. Laws ch. 151B, § 4(4); see also Morris v. Bos. Edison Co., 942 F. Supp. 65, 69 (D. Mass. 1996) (distinguishing between Section 4(4)'s "opposition" and "participation" clauses).

In the absence of direct evidence of retaliatory motive, to make out a prima facie case for retaliation under either Title VII or Chapter 151B, a plaintiff must plausibly plead that (1) she engaged in protected conduct, (2) she was subject to an adverse employment action, and (3) there was a causal connection between the two. Rae v. Woburn Pub. Sch., 113 F.4th 86, 100 (1st Cir. 2024), cert. denied, 145 S. Ct. 1431 (2025); see also Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 555 (1st Cir. 2018) (Title VII); Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 530 (Mass. 2011) (Chapter 151B). With respect to the third element, both Title VII and Massachusetts state law require a plaintiff to establish that the protected activity was a but-for cause—not merely a "motivating factor"—of the alleged adverse employment action. Stratton, 113 F.4th at 44; see also Rae, 113 F.4th at 109 (holding that "district court should have assessed whether [plaintiff] had plausibly alleged that her . . . protected activity . . . was the but-for cause of the retaliatory conduct she suffered"). This standard "protects against a poor-performing employee shielding themselves from termination by the mere fact that they engaged in protected conduct," Stratton, 113 F.4th at 44, and leaves employers free to enforce rules against employees who engage in protected conduct just as they would against anyone else, Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 117 (1st Cir. 2024); see also Frith, 38 F.4th at 277 ("[E]mployers are

not required to 'suspend previously planned [conduct] upon discovering that' employees have engaged in oppositional, protected conduct." (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001))). As with discrimination claims, "plaintiffs need not plead facts in the complaint that establish a prima facie case" of retaliation, but their allegations must "make the claim as a whole at least plausible." Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) (quoting Ocasio-Hernández, 640 F.3d at 15).

Here, although HealthEquity does not raise the issue, the Court is skeptical that what Grygiel terms "self-help discovery," [Am. Compl. ¶ 86]—that is, the forwarding of company documents to her personal email, which Grygiel asserts, in wholly conclusory terms, she did "[t]o preserve evidence for potential claims," [id. ¶ 83]—is protected conduct under either Title VII or Chapter 151B. See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (noting that, under Title VII, "[p]rotected conduct 'refers to action taken to protest or oppose statutorily prohibited discrimination'" (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009))); Nedder v. UMass Mem'l Health Care, Inc., 772 F. Supp. 3d 87, 94 (D. Mass. 2025) (noting that, under Chapter 151B, protected conduct includes "activities 'to protest or oppose statutorily prohibited discrimination,'" such as "informal protests of discriminatory employment practices, including making complaints to management" (first quoting Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 783 (Mass. 2016), and then quoting Jacquet v. City of Somerville, No. 18-cv-10167, 2020 WL 3545535, at *4 (D. Mass. June 30, 2020))).

Even assuming, however, that Grygiel engaged in protected conduct, her retaliation claims founder for the same reason as her discrimination claims, that is, because she has not plausibly alleged that any protected conduct was the but-for cause of HealthEquity's firing of

her. Grygiel's allegation that HealthEquity fired her "because of" her protected activity, [Am. Compl. ¶ 102], is conclusory and speculative, as is her assertion that HealthEquity "conveniently exploited, deliberately misconstrued, and exaggerated [her] self-help discovery efforts as alleged policy violations," [id. ¶ 86]. The plausibility of these allegations is greatly weakened, moreover, by Grygiel's acknowledgment that HealthEquity stated it was firing her for violating company policy. [Id. ¶ 87]. The Court appreciates that Grygiel's burden is low, and that it is rare for retaliation claims to be dismissed on causation grounds at the pleading stage. See, e.g., Rae, 113 F.4th at 110 (affirming dismissal of Title VII and Chapter 151B retaliation claims, but noting that they "should not have been dismissed for failure to sufficiently plead causation"); Garayalde-Rijos, 747 F.3d at 25 & n.8 (reversing dismissal of Title VII discrimination claim based on lack of temporal proximity between protected conduct and adverse action). But see Frith, 38 F.4th at 277 (affirming dismissal of Title VII claims on causation grounds). Nevertheless, in this instance, Grygiel's allegations, even construed in the light most favorable to her and viewed in the aggregate, are "so 'threadbare' that they are in essence conclusory," Rodríguez-Vives v. P. R. Firefighters Corps of P. R., 743 F.3d 278, 286 (1st Cir. 2014), and do not make her retaliation claims plausible. Accordingly, HealthEquity's motion is **GRANTED** as to Counts III and IV.

### C. Interference (Count V)

Count V targets HealthEquity's alleged efforts to prevent Grygiel from getting a new job after it fired her, alleging that HealthEquity "intentionally interfered with Grygiel's right to be free of discrimination by interfering with her future employment prospects." [Am. Compl. ¶ 131]. HealthEquity moves to dismiss this claim on the grounds that it is based on "rank speculation," arguing that the mere fact that Grygiel was unsuccessful in her initial job search

does not permit the reasonable inference that HealthEquity was responsible. [ECF No. 14 at 9–10]. Grygiel responds that her allegations are sufficient, pointing in particular to her allegation that she reached the final step of several prospective employment opportunities. [ECF No. 15 at 12–13].

Chapter 151B makes it unlawful "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter." Mass. Gen. Laws ch. 151B, § 4(4A); see also Sahli v. Bull HN Info. Sys., Inc., 774 N.E.2d 1085, 1089 (Mass. 2002) (describing interference claims as "separate and independent" from retaliation claims). To prevail on a claim of interference under Section 4(4A), a plaintiff must show that the defendant "interfered with her rights in deliberate disregard of those rights, which requires a showing of an intent to discriminate." Cocuzzo v. Trader Joe's E. Inc., 121 F.4th 924, 937 (1st Cir. 2024) (citation modified).

Here, the Court agrees with HealthEquity that the Amended Complaint does not plausibly allege that HealthEquity interfered with her efforts to find a new job. Even generously read, it alleges only that she was initially unsuccessful in securing new employment, succeeding only after nine months of "ardent and persistent job searching." [Am. Compl. ¶ 93]. Apart from the fact that she had, in the past, never been unemployed for more than a month, [id. ¶ 88], Grygiel provides no reason to think that this nine-month delay was caused by HealthEquity, except to allege, "[u]pon information and belief," that HealthEquity was badmouthing her to potential employers, [id. ¶ 98]. Without additional factual support, this allegation cannot "nudge[] [her] claim[] across the line from conceivable to plausible." Twombly, 550 U.S. at 570; see also Browder v. Ojikutu, No. 24-cv-11588, 2025 WL 2379682, at *6 (D. Mass. Aug. 15, 2025)

(discussing "allegations based 'on information and belief'"). Accordingly, HealthEquity's motion is **GRANTED** as to Count V.

### D. Wrongful Termination in Violation of Public Policy (Count VI)

In Count VI, Grygiel alleges that her termination was in violation of public policy, in that HealthEquity fired her "because she raised a good faith belief that [HealthEquity's] policies and practices could potentially lead to HIPAA violations or other health information related legal violations." [Am. Compl. ¶ 136]. HealthEquity moves to dismiss this claim on the grounds that Grygiel has not sufficiently alleged a violation of the applicable HIPAA regulations, that those regulations do not constitute a well-defined public policy, and because of the length of time between when Grygiel raised her HIPAA concerns, in May or June 2023, and her termination, in May 2024. [ECF No. 14 at 10–14]. Grygiel responds that her allegation that HealthEquity fired her because she articulated a good faith belief that HealthEquity's "database security practices or procedures could result in potential HIPAA violations" suffices to state a claim for wrongful termination. [ECF No. 15 at 13–14].

"The baseline common law rule in Massachusetts is that an employer may lawfully terminate a relationship with an at-will employee at any time—for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind." Murray v. Warren Pumps, LLC, 821 F.3d 77, 89 (1st Cir. 2016). Massachusetts law, however, "has recognized narrow exceptions to that rule when the employee is terminated 'contrary to a well-defined public policy.'" Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th 728, 744 (1st Cir. 2025). "The list of such public policies is narrow: '[R]edress is available for employees who are terminated 'for asserting a legally guaranteed right (e.g., filing [a] workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g.,

committing perjury).'" Id. (quoting Flesner v. Tech. Commc'ns Corp., 575 N.E.2d 1107, 1110 (Mass. 1991)). "Legal relief may also be available 'in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed.'" Id. at 744–45 (quoting Flesner, 575 N.E. at 1111). "Whether discharging an at-will employee for engaging in particular conduct violates public policy is a question of law for the court, and an at-will employee bears the burden of showing that it does." Wood v. City of Haverhill, No. 23-cv-12377, 2024 WL 4189932, at *9 (D. Mass. Sept. 13, 2024) (quoting Elliott-Lewis v. Abbott Lab'ys, Inc., 411 F. Supp. 3d 195, 208 (D. Mass. 2019)); see also Murray, 821 F.3d at 90 ("The burden lies with the at-will employee to establish that the substance of his workplace complaints for which he was discharged bears a direct connection to a sufficiently important and clearly defined public policy that warrants his protection from termination.").

Here, Grygiel's wrongful-termination claims fail for multiple reasons. First, Grygiel has not carried her burden of showing that firing an employee for reporting HIPAA violations is "contrary to a well-defined public policy." Sutherland, 126 F.4th at 744. The Amended Complaint speaks broadly of "potential HIPAA violations or other health information related legal violations," [Am. Compl. ¶ 134], and cites several statutes and regulations, [id. ¶ 7]. HealthEquity's briefing refers to a specific federal regulation, 45 C.F.R. § 160.316, that prohibits covered entities from retaliating against any individual or person for "[o]pposing any act or practice made unlawful by this subchapter, provided the individual or person has a good faith belief that the practice is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information," [ECF No. 14 at 11–12], and Grygiel in her opposition does not dispute that she seeks to invoke this regulation, see generally [ECF No. 15 at

13–14].[5] Regardless of the specific statutes or regulations that Grygiel may be seeking to invoke, however, the Court cannot conclude that any such provisions constitute a well-defined public policy sufficient to trigger the narrow exception to the general rule for at-will employment under Massachusetts law. See Gichuhi v. Alt. Supports, Inc., 57 N.E.3d 1066 (Mass. App. Ct. 2016) (unpublished table decision) (affirming dismissal of wrongful-termination claim premised, in part, on alleged HIPAA violations because "public safety or health was not implicated" and "[t]he internal whistleblowing, though socially desirable, lacked the necessary level of public importance that would bring the case within the 'important public deed' category for which redress is permitted"); Surprise v. Innovation Grp., Inc. / First Notice Sys., Inc., 925 F. Supp. 2d 134, 149 (D. Mass. 2013) (granting summary judgment to employer who allegedly fired employee for reporting HIPAA violations because "the court [could not] conclude that the requirements for disposal of HIPAA-protected materials w[ere] a well-defined public policy").

Second, Grygiel has not plausibly alleged that HealthEquity fired her because of her internal reporting of potential HIPAA violations. The allegation that HealthEquity "throughout her employment . . . retaliated against Grygiel because she had reported . . . significant security and privacy issues," [Am. Compl. ¶ 37], is wholly conclusory, as is her assertion that HealthEquity fired her, almost a year later, "because she [had] reported potential violations of HIPPA [sic]," [id. ¶ 106]. Because the Amended Complaint lacks sufficient facts, including any allegations connecting Grygiel's temporally distant conduct and her termination, to render her

[5] The regulations define "covered entity" to mean "[a] health plan," "[a] health care clearinghouse," or "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." 45 C.F.R. § 160.103. The Amended Complaint alleges that HealthEquity is a covered entity. [Am. Compl. ¶ 32]. The Court notes that HealthEquity denies it is a covered entity. [ECF No. 14 at 11 n.5].

claim of wrongful termination plausible, HealthEquity's motion to dismiss Count VI is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, HealthEquity's motion to dismiss, [ECF No. 13], is **GRANTED** with leave to amend. Any amended complaint shall be filed within two weeks of the date of this order.

**SO ORDERED.**

October 14, 2025

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Tracy Grygiel**
Plaintiff

V.

CIVIL ACTION

NO. **1:25-cv-11970-ADB**

**HealthEquity, Inc.**
Defendant

**ORDER OF DISMISSAL**

Burroughs, D. J.

Pursuant to the court's Memorandum and Order [Doc. No. 17] granting Defendants' Motion to Dismiss [Doc. No. 13], Plaintiffs' Amended Complaint [Doc. No. 11] is dismissed. This case is CLOSED.

IT IS SO ORDERED.

By the Court,

10/31/2025
Date

/s/ Caetlin McManus
Deputy Clerk